FILED

2019 Oct-01  AM 10:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION - BIRMINGHAM

| | |
|---|---|
| Vulcan Materials Company, Legacy Vulcan, LLC, Florida Rock Industries, Inc., Atlantic Granite Company, CalMat Co.,  Vulcan Aggregates Company, LLC, Vulcan Construction Materials, LLC, Fulton Concrete Company, LLC, McCartney Construction Company, Inc., Arundel Company, LLC, Harper Brothers, LLC, Maryland Rock Industries, LLC, Virginia Concrete Company, LLC, Maryland Stone, LLC, S & G Concrete Company, LLC, TCS Materials, LLC, Azusa Rock, LLC, Stone Creek Mira Mesa LLC, Triangle Rock Products, LLC, Aggregates USA, LLC, Chem-Marine Corporation of South Carolina, DMG Equipment Company, LLC, R. C. Smith Companies, LLC, Aggregates USA (Augusta), LLC, Aggregates USA (Macon), LLC, Aggregates USA (Savannah), LLC, and Aggregates USA (Sparta), LLC, | **JURY TRIAL DEMANDED**<br><br>**<u>COMPLAINT</u>** |

*Plaintiffs,*

v.

BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,

*Defendants.*

This is an antitrust action charging Defendants with price fixing in violation of Section 1 of the Sherman Act.  Plaintiffs bring this action against Defendants, from one or more of whom Plaintiffs directly purchased unregulated rail freight transportation services from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and by one or more of whom Plaintiffs

were assessed a rail fuel surcharge ("FSC") for the agreed-upon transportation.  As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

## NATURE OF THE ACTION

1.      In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy – under the guise of a fuel cost recovery program – to apply and enforce rail fuel surcharges across their customers in order to generate profits.  Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (all together, "Defendants") together controlled about **90%** of rail freight traffic in the United States during the Relevant Period.  Defendants used "rate-based" FSCs – *i.e.*, surcharges that use a percentage applied to the base rate for a shipment – as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis.   Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

2.      Prior to conspiring, Defendants operated as businesses should:  they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers.  According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004."  Defendants were aware of, and concerned about, this trend.  According to one CSX internal analysis from 2002, this decline resulted from factors including

"some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

3.      Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs.  These efforts failed.  Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs.  They were rarely included in contracts and more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts.  For example:

- BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "***We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace***. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it.  ***We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it***."

- In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that ***"[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause***," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities"

- As late as April 2003, UP's Bob Toy reported, "***Fuel surcharge $ are melting away at the competition***.  In a downward-pressure environment, what's on paper must not work in the real world."

4.      Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost.  As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at *actual* costs through the industry."  In that respect, Defendants were *already* recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

5.      In March 2003, everything began to change.  Rather than competing, Defendants began coordinating FSC programs.  Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "***no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . .***"  In short, Defendants stopped competing and started conspiring.

6.      On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates.  Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive.  ***The very next day***, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology."  ***Within one week***, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program ***matching*** UP's escalation.

7.      On March 18, 2003, BNSF and NS senior executives met to discuss "***synchroniz[ing]***" FSCs.  Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and

UP. ***Should BNSF's by [sic] synchronized with the other big players in the industry?***" The

answer based on what followed: a resounding yes.

8.      On March 20, 2003, CSX publicly announced a new, more aggressive FSC

program with a lower trigger and higher base-rate multiplier.  On March 31, 2003, UP decided to

adopt "***the same approach as the CSXT***."  On April 4, 2003, UP sent a "concurrence" to

competitors that its new FSC program will "apply to most Union Pacific pricing documents for

local and interline freight movements . . . ."  Upon receipt, BNSF marketing officer Paul

Anderson reacted ecstatically: "***This is sweet !!! Just like the CSXT***."

9.      On April 1, 2003, BNSF and CSX senior executives met.  The agenda dictated

that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "***Fuel***

***Surcharge***."  Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's

Lanigan continued a prior discussion on "***the fuel surcharge issue***" at a National Freight

Transportation Association meeting.

10.     Similar to CSX's abandonment of a less aggressive FSC regime following a

meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program

that could have been fairer for shippers.  Between February and April 2003, BNSF had been

"[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have

better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that

Defendants broadly implemented during the conspiracy), but abandoned this approach.  Instead,

BNSF and UP adopted nearly identical *rate-based* FSCs. An internal NS analysis found that

"Once [UP's $1.35 trigger] kicks in, ***it exactly matches the BNSF FSC percentage progression***,

including lag times and effective dates."

11.     Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray.  For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "***seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%***." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner, writing the "CSXT standard ***clearly produces significantly more compensation, and it does it sooner and more consistently***." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, ***the change is in fact a <u>blatant general rate increase</u>***, and will appear so to customers."

12.     Glennon was correct that customers saw the rate increases for what they were and were outraged.  Handwritten notes from a June 2003 meeting between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield, and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes.  The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and  that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

13.     But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere.  As an internal BNSF report from 2005 recognized,

however, this only worked because Defendants adhered to the scheme: "*it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall*."

14.     And, instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants maintained the scheme and imposed policies designed to ensure their new "standard" or "published" FSCs were enforced broadly across their customers without the waivers and discounts they had frequently offered between 2000 and 2002:

- **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "*Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed.*"

- **UP**:  On December 22, 2003, a sales representative explained to a customer, "As a company policy, all *contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice*."

- **CSX**:  A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "*NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge*."

- **NS**:  A 2004 email from Don Seale to his subordinates mandated "*no deviation from NS's published FSC without [his] prior approval*." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

15.     In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue enhancement mechanism.  As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index *Less Fuel* ("AAILF").  Defendants' conspiratorial implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

16.     Defendants worked tirelessly to achieve 100% FSC coverage across their customers.  All four Defendants pursued 100% participation goals and tracked their progress toward attaining that goal.  Defendants also policed the conspiracy by exchanging FSC coverage data with one another.  In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers.  Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy.  For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17.     Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits.  A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail

companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:



*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

18.     An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

19.     Defendants also attributed their record revenues to FSCs.  For example:

- **NS**'s 2006 "*[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase* and modestly higher traffic volume."

- **BNSF**'s freight revenues "*increased 15 percent [in 2006] to a record high of $14.5 billion* on double-digit increases in each of our four business units."

"***Growth in prices and fuel surcharges*** drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

- **UP** "achieved record revenue levels [in 2006] in all six of our commodity groups, ***primarily driven by better pricing and fuel surcharges***."

- **CSX**'s operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management ***and the Company's fuel surcharge program, which drove revenue per unit across all major markets.***"

## PARTIES

20.     Plaintiff **Vulcan Materials Company** ("VMC") is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; VMC brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

21.     Plaintiff **Legacy Vulcan, LLC ("Legacy Vulcan")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Legacy Vulcan brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

22.     Plaintiff **Florida Rock Industries, Inc. ("Florida Rock")** is a corporation organized under the laws of the State of Florida, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Florida Rock brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

23.     Plaintiff **Atlantic Granite Company ("Atlantic Granite")** is a corporation organized under the laws of the State of South Carolina, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Atlantic Granite brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

24.     Plaintiff **CalMat Co. ("CalMat")** is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; CalMat brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

25.     Plaintiff **Vulcan Aggregates Company, LLC ("Vulcan Aggregates")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Vulcan Aggregates brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

26.     Plaintiff **Vulcan Construction Materials, LLC ("Vulcan Construction")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Vulcan Construction brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

27.     Plaintiff **Fulton Concrete Company, LLC ("Fulton Concrete")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Fulton Concrete brings this

11

action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

28.     Plaintiff **McCartney Construction Company, Inc. ("McCartney")** is a corporation organized under the laws of the State of Alabama, with its principal place of business at  1200 Urban Center Drive, Birmingham, Alabama 35242;  McCartney brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

29.     Plaintiff **Arundel Company, LLC ("Arundel")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Arundel brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

30.     Plaintiff **Harper Brothers, LLC ("Harper Brothers")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Harper Brothers brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

31.     Plaintiff **Maryland Rock Industries, LLC ("Maryland Rock")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Maryland Rock brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

32.     Plaintiff **Virginia Concrete Company, LLC ("Virginia Concrete")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Virginia Concrete brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

33.     Plaintiff **Maryland Stone, LLC ("Maryland Stone")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Maryland Stone brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

34.     Plaintiff **S & G Concrete Company, LLC ("S & G Concrete")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; S&G Concrete brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

35.     Plaintiff **TCS Materials, LLC ("TCS Materials")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; TCS Materials brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

36.     Plaintiff **Azusa Rock, LLC ("Azusa Rock")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Azusa Rock brings this action in its own

name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

37.     Plaintiff **Stone Creek Mira Mesa LLC ("Stone Creek")** is a limited liability company organized under the laws of the State of California, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Stone Creek brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

38.     Plaintiff **Triangle Rock Products, LLC ("Triangle Rock")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Triangle Rock brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

39.     Plaintiff **Aggregates USA, LLC ("Aggregates USA")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Aggregates USA brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

40.     Plaintiff **Chem-Marine Corporation of South Carolina ("Chem-Marine")** is a corporation organized under the laws of the State of South Carolina, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Chem-Marine brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

41.     Plaintiff **DMG Equipment Company, LLC ("DMG Equipment")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; DMG Equipment brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

42.     Plaintiff **R. C. Smith Companies, LLC ("R. C. Smith")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; R. C. Smith brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

43.     Plaintiff **Aggregates USA (Augusta), LLC ("Aggregates Augusta")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Aggregates USA (Augusta) brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

44.     Plaintiff **Aggregates USA (Macon), LLC ("Aggregates Macon")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Aggregates Macon brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

45.     Plaintiff **Aggregates USA (Savannah), LLC ("Aggregates Savannah")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Aggregates

Savannah brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.

46.     Plaintiff **Aggregates USA (Sparta), LLC ("Aggregates Sparta")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama 35242; Aggregates Sparta brings this action in its own name and as successor-in-interest to any and all claims held by the entities listed in Appendix A to this Complaint.[1]

47.     During the Relevant Period, Plaintiffs purchased unregulated rail freight transportation directly from one or more of the Defendants, and during the Relevant Period one or more of the Defendants assessed FSCs on Plaintiffs in connection with that unregulated rail freight transportation.  The prices Plaintiffs paid to Defendants for unregulated rail freight transportation services on which FSCs were imposed were greater than the prices Plaintiffs would have paid absent the conspiracy alleged herein.  Plaintiffs have therefore been injured in their business and property by reason of Defendants' antitrust violations.

48.     Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

---

[1]  For the avoidance of doubt, as used in this Complaint, the term "Plaintiffs" refers to all of the Plaintiffs listed in paragraphs 20-46.  As used in this Complaint, "Plaintiffs" means each named Plaintiff and each of their respective predecessors-in-interest.

49.     Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.  NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

50.     Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS.  BNSF is a wholly owned subsidiary Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad.  BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

51.     Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.).  UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## JURISDICTION AND VENUE

52.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries

sustained by Plaintiffs by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

53.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

54.     Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

55.     This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

56.     During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States.  The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

57.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce.  During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States.  Each Defendant and their co-conspirators

used instrumentalities of interstate commerce to sell and market rail freight transportation

services.

58.     The unlawful activities of Defendants have had a direct, substantial, and

reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

59.     Congress deregulated the railroad industry with passage of the Staggers Rail Act

of 1980 ("Staggers Act").  This landmark legislation marked a dramatic change in the evolution

of U.S. railroads.  After decades of regulatory control over virtually every aspect of their

economic operations, railroads were free to set market rates for rail transportation.

60.     Prior to the Staggers Act, railroads for freight transport generally would only

charge the published tariff rates filed by the railroads with the Interstate Commerce Commission

("ICC").  During that era of full regulation, railroads could apply to the ICC for across-the-board

rate increases, which could lawfully be implemented on a collective basis.

61.     Today, by contrast, 80% or more of all rail shipments move under private

transportation contracts, which are not rate-regulated, or are otherwise exempt from rate

regulation.  For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like

the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the

railroads lawfully collude to set those rates.

62.     Since 1980, the number of Class I railroads has declined dramatically, from 35 at

the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian

entities).  The railroad industry is now (and was during the Relevant Period) highly concentrated:

four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90% of all

railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue.

Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the

need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

63.    Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

## DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD

64.    For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates.  Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates:  1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004."  Figure 1 from the *Study of Railroad Rates* evidences that trend:



65.    Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues.  These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs.  Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

66.    During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs.  The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share."  A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to

achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? ***We are still not together as an industry.  We are fighting for revenue share as opposed to rate adequacy***.

67.     During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs.  By way of example:

- **NS**: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty."  VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it."  The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC."  In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "***theoretically billable***."

- **CSX**: In August 2000, CSX reported at a staff meeting that it could collect only 67.4% of the then-modest FSCs it had billed over the preceding nine months.  EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "***very low***" and that he was "***embarrassed***" by the figure.

- **BNSF**: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does

not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "*any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive*."  Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003 – "in the 25 to 30 percent range."

- **UP**: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs.  This was true even though FSCs were generally not triggered and only "theoretically billable."  And in April 2003, Director Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

68.     The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively.  Defendants expressed these concerns internally and, in fact, lost business through FSC competition.  Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections.

23

69.     For example, in May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace."  It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that its main eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

70.     And, in May 2003, BNSF announced that it would ***reduce*** its standard FSC to 2% from 5% in May 2003 because a 5% FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage."   In response, UP observed internally that "Fuel surcharge $ are melting away at the competition.  In a downward-pressure environment, what's on paper must not work in the real world."

71.     Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF."  The RCAF is a weighted index that accounts for all significant input costs, including fuel.  The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

72.     Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping."  For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

24

73.     As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

## DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES

74.     By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants.  Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible.  By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

75.     Thus, beginning in the spring of 2003, Defendants' senior executives – including their CEOs and top sales/marketing executives – engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program.  The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

76.     The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

77.     On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly *reduced* the surcharges applied to shippers' base rates.

78.     That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski.  Under the UP "Revised" proposal, FSCs were

25

more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended.  The "Revised Surcharge proposal" retained the $28 WTI strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0% increase for every $5 increase in the WTI index.

79.     The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology."  Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden "talked on" the subject of "[f]uel surcharge methodology."

80.     On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy.  The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal."  Thus, under CSX's new FSC policy, CSX would assess a 0.4% FSC when the price of oil on the West Texas Intermediate (WTI) index exceeded $23 per barrel, and an additional 0.4% for every dollar increase above $23.48.

81.     Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month.  CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

82.     On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT."  Following the CSX approach, UP would impose a

0.4% FSC at a monthly-average WTI "trigger" price of $23 (*i.e.* the index price at which FSCs

begin), and assess an additional 0.4% charge for every dollar increase in the WTI index above

$23.  BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS,

had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the

CXST."

83.     On March 18, 2003, NS and BNSF senior executives – including NS's Chairman,

President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and

CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of

Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services

Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and

then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete

Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum–

met and discussed how the FSC programs of all four Defendants were structured, and then

adopted an "action item" for the BNSF and NS senior marketing officers to address

"synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants.  This

discussion point was assigned to NS's Seale and BNSF's Lanigan.

84.     On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association

meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

85.     The trade association meeting was the biannual National Freight Transportation

Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort, in

Litchfield Park, Arizona.  Each of the Defendants attended the meeting.  Almost immediately

following the NFTA meeting, a new internal directive was issued at BNSF that was designed to

ensure across-the-board FSC application: "Effective immediately and urgently per John

Lanigan[:]  Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

86.     On April 1, 2003,  CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, FL to discuss "Fuel Surcharge."

87.     In early 2003, BNSF had been leaning toward a mileage-based FSC and trying to drum up support within the industry for a mileage-based FSC formula.  But on May 7, 2003 – approximately one month after the NFTA meeting and its meeting with CSX – BNSF abandoned that effort.  Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the HDF index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

88.     Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index.  The BNSF FSC had been based on the HDF Index.  In or about July 2003, however, UP switched to the HDF Index.  From that point on, BNSF and UP (together, the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

89.     BNSF and UP agreed to administer the HDF Index in precisely the same way.  Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied.  When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5% for every five cent increase above $1.35 per gallon.  So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2%.  The FSC would increase 2% for every 20 cent increase in the HDF Index.

90.     The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation.  So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March.  The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

91.     The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed.  The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

92.     UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program.  In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed.  The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

93.     As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other

Defendants, including discussions of what FSC was "acceptable" to them  and the desirability of an industry-standard FSC.

94.     As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants.  As with CSX's program, NS would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter.  Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

95.     After NS's announcement, all four Defendants had essentially uniform FSCs and remained in synch throughout the Relevant Period.

### PUBLICATION OF THE AIILF AND FIXING FSC RATES

96.     Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs:  widely-used private contracts had cost escalation provisions that already accounted for fuel costs.  BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

97.     In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

98.     Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF).  This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component.  The AAR announcement in December 2003 stated:  "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel.  This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."  This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy.  The new AIILF specified the fourth quarter of 2002 as its base period.

99.     Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice.  The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs.  This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

100.     Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003.  When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing

Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR.  Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated:  "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

101.    Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index.  This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

102.    Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil.  When that happened, the Eastern Railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel.  So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2%.  The FSC would be adjusted upward at 2% for every $5 increase in the WTI average price.

103.    The Eastern Railroads also coordinated when they would change their FSC – two calendar months after the WTI Index had adjusted, thereby adopting the same FSC price timing used by the Western Railroads.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same FSC percentage month after month.  The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

32

104.   The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs:  including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed.  The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

105.   There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs.  The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes.  The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases.  As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period.  Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

106.   The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs.  Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the

program.  That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment).  Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on FSC prices to undercut one another.

107.    In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC [Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program."  The other Defendants "pushed back as expected."  Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

108.    With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period.  The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003:

### MONTHLY FSC PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |

| MONTH | BNSF | UP |
|---|---|---|
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |

| MONTH | BNSF | UP |
|---|---|---|
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

109.    As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, that they charged customers for most of the Relevant Period.  The chart below shows that the FSC percentages charged by Defendants CSX and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004:

**MONTHLY FSC PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |

| MONTH | CSX | NS |
|-------|-----|-----|
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06[2] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |

---

[2] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per barrel.  While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate."  NS had determined that a 16.4% base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program.  Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

| MONTH | CSX | NS |
|-------|-----|-----|
| Jun-07 | 16.4% | 16.4% |

110.     In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads.  Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year.  The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs.  In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

111.     Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage-based FSCs  – Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

112.     While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

113.     The direct heads of Defendants' intermodal businesses attended conspiratorial meetings.  NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum participated in the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address

"synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants.  CSX's

Alan Blumenfield, his predecessor Les Passa, and UP's Brad King EVP of Network Design and

Integration participated in the June 2003 meeting at which CSX and UP's senior executives

discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the

initial rollout of their new FSC regimes.  UP's intermodal group regularly imposed adjustable

FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's

FSCs. In fall of 2003, CSX and BNSF officers exchanged percentages of intermodal business

that "either had fuel surcharges or an escalator on the revenue."

114.    Moreover, Defendants' intermodal business was led by the same senior

executives who conspired to impose synchronized FSCs.  Intermodal was not treated separately

and apart from carload traffic.  When Defendants met to conspire, they did not limit their

discussions to carload traffic.

## IMPLEMENTATION OF THE SCHEME:
## DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs

115.    Defendants recognized that their coordinated FSCs were more aggressive and

could generate substantially more revenue.  For example, describing the new FSC program that

resulted from Defendants' coordination, CSX's John Couch remarked:  "While the above seems

somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much

as 100%."  In addition, an internal NS email from April 2003 remarked, "By dropping the base

to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a

blatant general rate increase, and will appear so to customers."

116.    Defendants recognized that their new aggressive FSC program could be

undermined by resistance from shippers and competition between the Defendant railroads.  A

2003 internal NS memorandum recognized that moving to the more aggressive formula would

"run the risk of losing the surcharge altogether. . . .  The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC."  And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

117.    To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100% of its traffic and tracked its progress toward attaining that goal.  For example, in 2004, BNSF marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis.  These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (*e.g.*, shippers with expiring contracts that do not include an FSC). The reports – showing increasing FSC coverage each year – were presented to the chief marketing officer with a goal of achieving a 100% participation rate for BNSF's shippers.

118.    CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate – that "[e]verything is subject to fuel surcharge."  CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal.

119.    Starting in early 2004, UP engaged in similar analyses.  An analysis of UP's FSC coverage was also performed for the chief marketing officer – who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."

120.    NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do

not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

121.    Defendants policed the conspiracy by exchanging FSC coverage data.  For example, subsequent to a meeting between the two railroads in late 2004, BNSF sent NS's Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

122.    In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations.  Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

123.    Defendants also enforced strict policies against discounting base rates to offset the standard FSCs.  For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."

124.    As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

125.    In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities.  For example, in October of 2005, NS advised UP as follows:  "We only have 1 fuel surcharge mechanism which applies to all commodities.  Our corporate directive is to stay with the standard language and avoid modifying it."

126.    And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation.  In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers – shippers without access to alternative modes of transportation – have leverage in negotiating a better rate/serve package on traffic at single served facilities.  He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

127.    Before the conspiracy, captive shippers could negotiate out of the FSCs.  But during the conspiracy they could not.

## THE STB DECISION

128.    On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).  In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates.  Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost

recovery mechanism. ***Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied***. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661,

January 26, 2007) at 6 (emphasis added).

129.    The STB's decision addressed rate-regulated rail freight traffic only (which is not

the subject of this Complaint).  The STB expressly stated that its jurisdiction did not reach rail

freight traffic under private contract or otherwise exempted from rate regulation.

130.    As detailed above, pursuant to their conspiracy, Defendants applied the same

unreasonable FSC practices addressed by the STB to the private rail freight transportation

contracts, and other unregulated freight transport, at issue in this case.

## THE CONSPIRACY SUCCEEDS

131.    Defendants reaped huge, supracompetitive profits as a result of the success of

their conspiracy.  Through their agreement to coordinate on FSCs, Defendants realized billions

of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs

from the specific customers on whom they imposed the FSC.

132.    Defendants recognized that their coordinated FSCs in fact resulted in significant

over-recovery of fuel price increases.  NS, for example, recognized by July 2004 that "[c]urrent

FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base,"

and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded

the increase in its diesel fuel, gasoline, and lubricant expenses."

133.    UP senior management instructed that fuel surcharges were not intended to be set

at "some 'trying to make whole' value" and UP's CFO saw  "nothing wrong with recovering at a

rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100% of incremental fuel cost recovery through FSCs for each of its six business groups.

134.     BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon.  Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004.  In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase.  As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004.  Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

135.     By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.  As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving."  BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years.  In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

136.     As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years.  As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

137.    Following Defendants' agreement to coordinate their FSCs,  Defendants' total revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year.  As noted above, Defendants themselves attributed these record figures in large part to FSCs.

138.    As result of Defendants' conspiracy they were able to reverse the "destructive pricing for rail share" that led to their conspiracy.  In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004."  The STB concluded that while rising fuel costs contributed to the rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

139.    And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade.  Figure I demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%."  The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:



*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

## COUNT I

### (Violation Of The Section 1 Of The Sherman Act And Section 4 Of The Clayton Act)

140.    Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

141.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

142.    The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

143.    Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

144.    Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

145.    The contract, combination, or conspiracy has had the following effects:

   a.    Prices charged to Plaintiffs for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

   b.    Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

      c.      competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

146.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supracompetitive prices for FSCs applied to unregulated rail freight transportation services during the Relevant Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1)    That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2)    That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained by Plaintiffs, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3)    That Plaintiffs recover treble damages, as provided by law;

(4)    That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(5)    For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

*[Remainder of page intentionally left blank.]*

Dated:  September 30, 2019
        Birmingham, Alabama

By:
    BADHAM & BUCK, LLC


/s/  Brannon J. Buck
Brannon J. Buck (ASB-5848-K56B)
Christopher B. Driver (ASB-9178-G39B)
2001 Park Place North, Suite 500 •
Birmingham, AL 35203
Telephone: (205) 521-0036
Email:  bbuck@badhambuck.com
       cdriver@badhambuck.com

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP

Stephen R. Neuwirth
Sami H. Rashid
Monica E. Tarazi
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com
      samirashid@quinnemanuel.com
      monicatarazi@quinnemanuel.com

Robert P. Vance, Jr.
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443 3000
Facsimile: (213) 443 3100
Email:  bobbyvance@quinnemanuel.com

*Attorneys for Plaintiffs Vulcan Materials
Company, Legacy Vulcan, LLC, Florida Rock
Industries, Inc., Atlantic Granite Company,
CalMat Co., Vulcan Aggregates Company,
LLC, Vulcan Construction Materials, LLC,
Fulton Concrete Company, LLC, McCartney
Construction Company, Inc., Arundel
Company, LLC, Harper Brothers, LLC,*

*Maryland Rock Industries, LLC, Virginia Concrete Company, LLC, Maryland Stone, LLC, S & G Concrete Company, LLC, TCS Materials, LLC, Azusa Rock, LLC, Stone Creek Mira Mesa LLC,, Triangle Rock Products, LLC, Aggregates USA, LLC, Chem-Marine Corporation of South Carolina, DMG Equipment Company, LLC, R. C. Smith Companies, LLC, Aggregates USA (Augusta), LLC, Aggregates USA (Macon), LLC, Aggregates USA (Savannah), LLC, and Aggregates USA (Sparta), LLC*